# THE MUTUAL FIRE INSURANCE COMPANY OF NEW YORK

*v.*

## CHARLES P. SWIGERT, Auditor.

*Filed at Springfield March 25, 1887.*

1. INSURANCE COMPANIES — *of the different forms of organization known to the laws.* Under the various legislation of this State, every kind of ordinary insurance may be attained under three forms of organization, viz., stock companies, mutual companies, and companies formed on the assessment plan. These three are the only kinds of insurance companies known to our laws.

2. SAME—*foreign companies—of the conditions upon which they may transact business in this State.* Every insurance company of any other State must comply with the laws of this State before it shall be lawful for it to take any risks in this State, and when such foreign company complies with our laws on the subject, it may receive a license to carry on the business of insurance here.

3. Under the legislation in this State, provision is made for the organization of only two kinds of fire insurance companies, viz., joint stock companies, and companies organized on the mutual plan; and a foreign company must be one or the other of these, before it can be authorized to transact business in this State.

4. A fire insurance company organized under the laws of another State, which has not complied with the requirements of the general insurance laws of this State, in its organization and mode of transacting business, and which is not possessed of the actual capital required of a similar company formed under the provisions of our laws, is not entitled to receive a license to enable it to transact the business of fire insurance in this State.

5. SAME—*whether a company is organized on the mutual plan.* The charter of the "Mutual Fire Insurance Company," a corporation organized under the laws of the State of New York, contained the following: "In lieu of the notes and of the agreements for insurance with four hundred applicants, as provided in chapter 466, section 6, of Laws of 1853, the said company is authorized to receive from any number of persons subscriptions payable in cash, and give therefor receipts bearing interest, which receipts shall severally set forth that they are given for money received in advance for premiums of insurance, and the amounts of the same, and every part thereof, are liable for the expenses and losses of said company; and the said receipts shall be received by said company only in payment for premiums of insurance, or on account thereof; and the company may commence business on the mutual plan as soon as the whole amount so subscribed and paid in cash shall reach

the sum of $200,000." The charter provided for dividing the profits among the insured, the dividends to be made in scrip, bearing interest, redeemable and transferable, subject to be reduced to pay losses and expenses, but not to be redeemable until it should exceed $200,000, and then to the extent of the excess only. The rule for ascertaining the profits was as follows: All moneys received for interest, and premiums earned during the year, to be considered gross receipts; after deducting general expenses, taxes, losses, interest paid and payable, and all other contingent expenses, charges and liabilities, the balance to be considered the profits of the business.

6. In considering the application of this foreign company for a license to transact the business of fire insurance in this State, the company did not assume to be organized upon the "stock" plan, and it was *held*, it was not organized on the mutual plan, and so, not having the elements of either kind, it could not, under the law, be given license to transact business in this State.

7. The objection taken to the charter of the company, as depriving it of the proper element of mutuality, was the feature which permits the so-called "capital" of the company to consist in outstanding interest bearing obligations in the hands of strangers, to pay the interest on which the policyholders must contribute out of the earnings of the company, before they can participate in the profits of the business.

This is an original petition, filed in this court by the Mutual Fire Insurance Company of New York, for a *mandamus*, compelling the Auditor of Public Accounts to issue to the petitioner a license to carry on the business of fire insurance in this State. The material facts of the case appear in the opinion of the court.

Messrs. GRANT & BRADY, for the petitioners.

Mr. GEORGE HUNT, Attorney General, for the respondent.

Mr. JUSTICE SHOPE delivered the opinion of the Court:

This is an original proceeding in this court, to compel, by *mandamus*, the Auditor of Public Accounts to issue a license to relator for the transaction of the business of fire insurance in this State.

The relator, the Mutual Fire Insurance Company of New York, shows, by its petition filed herein, that it is a corporation organized under the laws of the State of New York, and

makes exhibit of its charter and by-laws; that it made formal application to the Auditor of this State for license to do business in this State, and offered to accept such license therefor in accordance with the laws of this State; that with its application it presented to the Auditor a statement of its affairs and condition for six months next preceding such application, and a copy of an examination of its condition by the insurance department of the State of Minnesota, and evidence of the appointment of an attorney in this State, upon whom service of process might be had; and averring that it had complied with all the requirements of section 1 of the act of the General Assembly of this State, of June 4, 1879, and with all other requirements of the laws of this State relating to the admission of relator, as a foreign insurance company, to do business in this State, and that it thereupon became the duty of the Auditor to issue to it a license for that purpose, by law, but that he refused to do so, etc. To this petition, the respondent, by the Attorney General, interposed a general and special demurrer.

The laws of this State authorize the formation and organization of insurance companies in this State for various purposes, among which purposes is that of insuring against loss by fire. An examination of the various insurance acts upon the statute books of this State, whether spoken of as fire, township fire, as life or life indemnity, or accident or permanent disability, upon the assessment plan, shows, that all these different purposes are to be attained under three forms or kinds of organization, viz: stock companies, mutual companies, and companies formed on the assessment plan. When, therefore, the citizens of this State desire to enter upon the business of insurance, and to avail themselves of the benefits of corporate organization under the laws of this State, they can do so only in the form and subject to the restrictions and regulations prescribed by law, — and the only kinds of companies known to our laws are the three just mentioned.

By the act of May 31, 1879, (Starr & Curtis, p. 1330,) it is declared, "that every insurance company or association incorporated by or organized under the laws of any other State * * * must comply with the requirements of the general insurance laws of this State governing fire, marine and inland navigation insurance companies doing business in the State of Illinois, before it shall be lawful for such company or association to take risks or transact any kind of insurance business in this State." By the act of June 4, 1879, (Starr & Curtis, p. 1331,) it is declared unlawful for any insurance company organized under the laws of another State, for the purpose of insuring against loss or damage by fire, to take risks, or transact any business whatever authorized by its charter, within this State, until it shall have made application to the Auditor for a license, declaring in such application that it desires to transact the business of insurance in this State; that it will accept a license therefor, according to the laws of this State, which shall be revoked on its removing or making application to remove a cause arising out of the business it may transact in this State, from a State to a United States court; and on its complying with these requirements, "together with all other requirements now imposed by existing laws," the Auditor shall issue a license, etc.; but "no such license shall be issued until all of said requirements shall have been complied with," nor shall any company "carry on the business for which it may have been incorporated, within this State, until it shall have obtained such license."

The general Insurance law of March 11, 1869, (with its amendments,) "to incorporate and govern fire * * * insurance companies doing business in the State of Illinois," (Starr & Curtis, p. 1310, *et seq.*, sec. 22,) declares it unlawful for any insurance company "organized under the laws of any other State of the United States, * * * for any of the purposes specified in this act, directly or indirectly to take risks or transact any business of insurance in this State

unless possessed of the amount of actual capital required of similar companies formed under the provisions of this act; * * * and shall appoint a resident attorney, on whom service of process may be made; file with the Auditor a certified copy of its charter and a verified statement of its chief officer, showing its name, place of business, amount of capital stock, and a detailed statement of its assets and liabilities of every kind." The sixth section of said act prohibits· the formation of any "joint stock company" in Chicago, or with an established agency in that city, for the purpose of insurance, "with a smaller capital than $150,000 actually paid in, in cash;" or in any other county in the State with a smaller capital than $100,000 actually paid in, in cash; and no fire insurance company, organized on the mutual plan, can be incorporated and do business in Chicago, or with an established agency in that city, "until agreements for insurance have been entered into with at least four hundred applicants, the premiums on which shall amount to not less than $200,-000, of which $40,000 at least shall have been paid in, in cash, and notes of solvent parties, founded on actual and *bona fide* applications for insurance, shall have been received for the remainder;" nor in any other part of the State "until agreements have been entered into for insurance with at least one hundred applicants, the premium on which shall amount to not less than $50,000, of which $10,000 at least shall have been paid in cash, and notes of solvent parties, founded on actual and *bona fide* applications for insurance, shall have been received for the remainder." None of the notes referred to shall exceed $1000, and two notes.shall not be given for the same risk, or made by the same person or firm, unless the whole amount is less than $1000, "nor shall any such note be represented as capital stock unless a policy be issued upon the same," etc. "Each of the notes is required to be made payable, in whole or in part, at any time when the directors shall deem the same requisite for the pay-

ment of losses by fire, * * * and such incidental expenses as may be necessary." The act requires a certificate of a local justice of the peace, of the solvency of the maker of the notes, and prohibits surrender of any note during the life of the policy for which it is given. Section 14 of the act provides, that notes taken by a mutual company at the time of its organization, "shall remain as security for all losses and claims, until the accumulation of premium notes and assets invested, etc., shall equal the amount of cash capital required to be possessed by stock companies organized under this act." Every person effecting insurance in any mutual company is made a member of the corporation during the period of insurance, "and shall be bound to pay for losses and such necessary expenses * * * accruing in and to said company, in proportion to the amount of his deposit, note or notes."

It will be seen that in respect of fire insurance companies provision is made for the organization of only two kinds, viz : joint stock companies and companies organized on the mutual plan. If the relator is either a joint stock company or organized as a mutual company, and in either case is possessed of the capital required by the laws of this State to be possessed by like companies organized thereunder, and has in other respects complied with the prerequisites provided in the statute, the license should have been granted, otherwise the Auditor properly refused to grant the same.

It is shown by the petition, and exhibits made part thereof, that the relator was first organized in 1869, under the general Insurance law of New York, (chap. 466, Laws 1853,) as a joint stock company, under the name of "Insurers' Own Insurance Company." The second section of its charter provides that its capital stock should be $200,000, divided into shares of $25 each, and the whole capital should be employed in its business. April 13, 1870, a special act was passed by the legislature of New York, changing the name of the com-

pany to "Mutual Fire Insurance Company," and amending the second section of its charter so as to read as follows:

"Section 2. In lieu of the notes and of the agreements for insurance with four hundred applicants, as provided in chapter 466, section 6, of Laws of 1853, the said company is authorized to receive from any number of persons subscriptions payable in cash, and give therefor receipts bearing interest, which receipts shall severally set forth that they are given for money received in advance for premiums of insurance, and that the amounts of the same, and every part thereof, are liable for the expenses and losses of said company; and the said receipts shall be received by said company only in payment for premiums of insurance, or on account thereof; and the company may commence business on the mutual plan as soon as the whole amount so subscribed and paid in cash shall reach the sum of $200,000."

—Thereby doing away with the provision requiring capital stock, and authorizing the company to do "business on the mutual plan, as soon as the whole amount so subscribed and paid in cash shall reach the sum of $200,000." By the sixth section of its charter, the board of trustees of the company are authorized to divide among the insured the whole or any part of the profits of the business, such dividends to be made in scrip, which scrip may be issued in such form and for such amounts, and bear such rate of interest, and be redeemable and transferable, and be subject to be reduced to pay losses and expenses, in such manner, as may be determined by the by-laws of the company, but none of said scrip to be "redeemable until it exceed $200,000, and then to the extent of the excess only." Section 7 provides that the profits of the company shall be determined as follows: "All moneys received for interest, and premiums earned during the year, shall be considered gross receipts. After deducting general expenses, taxes, losses, interest paid and payable, and all other contingent expenses, charges and liabilities, the balance shall be

considered the profits of the business." By article 12 of the
by-laws of the company, the profits that may be declared by
the trustees are to be divided in scrip of the company, and
which is to bear interest not exceeding six per centum per
annum.

Again, in 1878, by another special act of the legislature of
New York, the company was authorized to unite with its mu-
tual plan a cash capital of $30,000, to be divided into shares
of $50 each, the shareholders to be entitled to interest on their
shares, without incurring any liability as shareholders for the
liabilities of the company, but with a right, in certain cases,
to participation in the profits of the company, not in excess,
however, of one-fourth thereof. This stock capital, if paid in,
would not, as we have seen, be sufficient in amount to author-
ize relator to do business in this State as a stock company,
and it appears by the statement of the company, filed with
the Auditor, that it has no "joint stock" capital. It appears
that the company has never availed itself of the provisions of
this amendment to its charter. By the statement of relator
company exhibited, it also appears that its "whole amount
of contribution, forming capital actually paid up in cash,
is $338,248.22." It is also shown, by the certificate of the
superintendent of the insurance department of New York,
that relator company is "authorized (in that State) to issue
policies and transact business as a mutual fire insurance
company, with a premium capital of $200,000, contributed."

Originally, the relator company was organized as a joint
stock company, with sufficient authorized capital to have en-
abled it to do business in this State. It is manifest, however,
that the special act of April 13, 1870, amending the second
section of its charter, essentially changed its character, and
it is now recognized by the insurance authorities of its own
State, not as a stock company, but as a mutual company.
This amendment did more than to take away from the cor-
poration its character of a joint stock company, and thereby

bring the corporation within the operation of the general insurance laws of New York, in respect of mutual insurance companies. Had that been the only effect, it is obvious, from the language of the amendment itself, that before the corporation could have engaged in business it must have secured "notes and the agreement for insurance of four hundred applicants,"—substantially as required in that respect of companies organized in this State on the mutual plan. But by this amendment it is provided, that in "lieu" of such notes and applications for insurance, the corporation might incur an interest-bearing indebtedness of $200,000, and call that its paid-in capital. It can not change the essential character of this power of the corporation, that the receipts or obligations of the company given for this borrowed capital, stipulate that it is "for money received in advance for premiums of insurance," for it is nowhere provided, either in the charter or by-laws, that the persons thus subscribing or loaning money to the company, ostensibly for premiums for insurance, should take policies of insurance the premiums on which should amount to such advance or contribution at the time of making the same, or at any time, and thus furnish the means of taking up and getting out of the way this $200,000 of interest-bearing obligations of the company. Indeed, so far as we can see, there is no provision for removing this burthen from the company, and the policy of the company would indicate that it was intended to be permanent, for it appears that the interest-bearing contribution to relator's so-called capital has been extended to $338,248.22,—greatly in excess of the amount stipulated as necessary by its charter, as amended; and within the six months next preceding the application to the Auditor, it is shown by the verified exhibit of the condition of the company, that carried into the "income" account is an item of "contributions forming additional capital for which the company's certificates had been issued for premiums on policies not yet issued, $86,079.70."

There seems to be no limit to the expansion of the "contributed capital" of the company, nor is it stipulated in the by-laws or charter of the company what rate of interest shall be paid on such contributions. As we understand, the interest on scrip given for dividends of profits is limited by the by-laws to not exceeding six per cent per annum, but no such limitation is fixed upon contributions to capital. It seems, also, that the company treats this indebtedness of the company as stock, for it is shown by said exhibit that the "total amount of the company's stock owned by the directors, at par value, (is) $67,902.50." The directors are holders, to that amount, of the interest-bearing receipts for premiums on policies of insurance "not yet issued," as may be fairly inferred. If it should be contended that this interest-bearing "capital" can be paid off by the accumulations of profit, (scrip,) it can not, as we have seen, be reduced below $200,000. Thus it will be seen, that as a mutual company the relator must remain burdened with the payment of interest upon this large sum of money, and which may be increased practically without limit. The persons making these contributions or advances are not required to be or become members of the corporation, bearing its burdens in common with its policyholders. Before the policyholders can participate in the earnings of the company, the contributors must receive their interest, which, as we have seen, is to be paid before the profits are ascertained or declared, and which are a fixed charge on the revenues of the company. The policyholder, in addition to the cost of carrying his risk upon the ordinary mutual plan, as contemplated in the organization of mutual insurance companies in this State, must pay such interest.

The conclusion seems irresistible, that, whatever else this corporation may be, it can not be said to be a corporation for insurance, organized and doing business on the mutual plan, as known and contemplated by the laws of this State, or having any resemblance thereto. By the laws of this State, there

is, in any event, contemplated the union of at least one hundred policyholders, and if the company is organized in or has an established agency in Chicago, not less than four hundred policyholders, in each mutual insurance company organized thereunder. The premiums, as we have seen in the former case, upon actual and *bona fide* applications for insurance in the company, must amount to $50,000, and in the latter, to $200,000, twenty per cent of which must be paid in, in cash, and the residue, in either case, represented by notes of solvent parties who are actual and *bona fide* applicants for insurance to an amount equaling the premiums represented by the cash paid in, and notes given to the company. The fund thus formed represents the capital of the company. The makers of these notes, representing the insurance under the policies of the company issued therefor, are members of the corporation, and mutually liable, to the amount represented by their notes, for the contracts and liabilities of the company. The aggregate of the policyholders are therefore, in a sense, the insurers of each policyholder. When a company thus organized begins business, it has a capital of $10,000 cash, paid in, and $40,000 in obligations of solvent members of the company, in one case, and $40,000 cash, paid in, and $160,000 in notes of solvent policyholders, or applicants for the same, in the other. Its capital is represented by actual insurance. It is free from debt, incapable of contracting liabilities such as that assumed by relator or any other, except in the legitimate business for which it is organized, and may, at any time, realize upon its unpaid capital. The premiums must be applied to the payment of legitimate expenses and losses, or accumulation of capital.

It is clearly apparent the relator company has not complied "with the requirements of the general insurance laws of this State governing fire * * * insurance companies," nor is it "possessed of the amount of actual capital required of similar companies formed under the provisions" of the insurance

laws of this State. It is manifest that no domestic company organized upon the plan and basis of the relator company could be permitted to do business under the laws of this State. The policy of the State toward insurance companies organized under the laws of other States is neither narrow nor illiberal. They are placed upon the same footing and granted the same rights and privileges accorded those formed by citizens of the State, under its laws. The statutes of the State provide for the organization of companies upon each of the leading and recognized plans of insurance, and providing only such safe-guards as in the legislative wisdom are necessary to promote the best interests of the company itself, and furnish adequate guaranties of safety and indemnity to policyholders. That this is clearly within the power and control of the legislature, as here exercised, is so manifest that no citation of authority is needful to sustain the position.

Where we hold, as we do, that before relator company is entitled to a license to do business in this State, it must, in respect of its organization and the security and indemnity it offers its policyholders, have complied with the general laws of the State, we are applying the same rule that would, of neces-sity, be applied to domestic corporations for like purposes. If the rule thus applied results in denying relator company the license it desires, it is because it has failed to comply with the law, and has, by its organization, mode of acquiring its capital, and failure to provide the capital required by laws of this State for a like company organized here, put itself outside of the domain of legitimate insurance companies, as recognized by the laws of this State.

We are of opinion that the application of the relator com-pany for license to do business in this State was properly refused by the Auditor. The demurrer to the petition will therefore be sustained, and the petition dismissed.

*Writ denied.*